Mr. McKinney v. City of Middletown, Ms. Olenowicz-Hess May it please the Court, my name is Alexandra Olenowicz-Hess for Plaintiff Appellant William McKinney. Defendants in this case, the officers of the Middletown Police Department, picked a dog on Mr. McKinney while he was confined in a 7x7 cell at the police station. Without warning, the defendant ordered the dog to bite Mr. McKinney's leg, and they permitted him to do so for two minutes, causing injuries that, in the words of a doctor, were consistent with the dog eating a portion of his leg. At the same time, they repeatedly struck Mr. McKinney in the head with a baton, so forcefully that he needed several staples to close his wound. And, for good measure, they tased him while he was on the ground. The District Court nevertheless held that the officers were entitled to qualified immunity, but that was error for the reasons set forth in our brief, and I'd like to focus my argument today on two of those reasons. First, the District Court failed to construe the facts in the light most favorable to Mr. McKinney as it was required to do. That was error. Based on Mr. McKinney's version of events, which I will describe in a moment, the defendants are not entitled to qualified immunity as they violated clearly established law. Second, the Rule 56.1 statement does not change this analysis, because even assuming Mr. McKinney actively resisted the officers the entire time, their conduct still violated clearly established law. The District Court treated the Rule 56.1 statement as dispositive admission, ignoring the law and contrary facts in the record. That, too, was error. Based on these errors and those outlined in our brief, this Court should vacate the judgment and remand for trial. I'd like to first turn to Mr. McKinney's version of events. According to Mr. McKinney, Officer Siebels entered the cell and bashed him in the head with a baton. Mr. McKinney fell backwards. He fell with his arm pinned beneath him. Then he felt the dog bite him. He looked down and saw the dog biting him over and over again in his right leg. Officer DiResta yelled, get him, get him. The officers put his free hand in handcuffs. Officer Siebels continued to bash Mr. McKinney in the head, and then Officer Ward tased Mr. McKinney in his left shoulder. Siebels and Ward then put their weight on top of Mr. McKinney as DiResta shouted for McKinney to be pinned down so Hunter could continue to bite him. Defendants continued to beat McKinney for failing to offer his other hand to be handcuffed. Despite the fact that Mr. McKinney was pinned beneath two of the officers and unable to remove his arm from under his back. Defendants eventually rolled Mr. McKinney over, handcuffed his second hand, and removed him from the cell. Importantly, Mr. McKinney denies ever hearing a canine, and he also denies hearing any warning that he would be bitten by a dog. Importantly, Hunter, the canine, was not trained for this purpose. Is the warning necessary? I mean, I think McKinney does admit that he had tried to seize Officer Siebels' baton, so wouldn't that mean there was exigent circumstances, there was like an ongoing struggle? No, Your Honor, because Mr. McKinney, the first officer director said he did give a warning, so there was clearly enough opportunity to give a warning, although neither Officer Warden or Officer Siebel ever heard said warning, so exigent circumstances don't apply here. Moreover, it was clearly established that a warning was required to be given at the time that this occurred. I think you just said there was an initial warning. You were just saying that there wasn't a separate warning when releasing the dog. There was no warning. According to Mr. McKinney, there was no warning at all. Yeah, you're saying, counsel, you're saying that if we take the fact most favorably to your client, the fact that he didn't hear is evidence that there was no, that nothing was said. That's what we held in a case called Franco. I wrote the opinion. It doesn't mean that there wasn't a warning, but taking the fact in the most favorable, which we have to do on a qualified immunity situation, there was no warning. Is that what you're saying? That's correct, Your Honor. Moreover, in addition to the fact there was no warning, Hunter was not trained for use in a cell extraction, and it was clearly established at the time of this incident, 2011, that an improperly trained dog used for an improper purpose violates Mr. McKinney's Fourth Amendment rights. The defendants do not argue with this case law and, in fact, don't have contradicted in any way in their brief. He was put into the cell for his own safety, right? The defendant officer said they decided to move him, quote, unquote, into the padded cell for his own safety. When you look at that cell on the video, the cell can only contain him, really. It's so small, and it seems inevitable that if a dog is sent in there, it's going to bite him. Yes, Your Honor. Exactly. It is inevitable, and plus it was improperly used in the circumstance. Hunter is a patrol dog, not a cell extraction dog. I'm sorry, but you're saying that the reason why Hunter was not trained is because he's being used for cell extraction, but couldn't you also understand him as being used to subdue McKinney, who was resisting the officers, and he was trained to subdue a suspect, right? There's a difference. You're asking us to conclude that it's not just simply that he's untrained. He was trained, but you could consider him untrained only if you think cell extraction is a different – he would require some kind of separate training in cell extraction as opposed to training in subduing a suspect. Yes, that's correct. And it points to cases in which there is a difference. But in this case, the dog is not being used to drag him out of the cell and move him somewhere else. It's being used to subdue him so that they could put handcuffs on him, right? So the dog is just being used to subdue him. I think there's a dispute of fact as to what the purpose of using Hunter was in the cell. So, yes, on the one hand, they argue that he was being used to being subdued, but on the other hand, Mr. McKinney argued that he had already been subdued at the point that Hunter was used to bite his leg. Well, but that counsel is a different argument. You are saying that the dog continued to attack him after he was subdued. And so you're saying that that is something that is undue force and not covered by qualified immunity. That's a different issue from the question of whether the dog was or was not trained to do something that never really occurred. And so there's a genuine dispute of fact that, for example, the plaintiff's expert testified that the dog should not have been there for use in that cell. Again, that's a different question, really, from the question of whether there was training or not to do something that never occurred, which was to try to have the dog extracted. I think they're part and parcel of the same thing. And moreover, Sergeant Kodesis, who was the sergeant for the statewide Connecticut K9 training program, said that dogs are not trained for use in cell extraction. And there's clearly established law at the time of this incident that an improperly trained dog cannot – the use of an improperly trained dog is unreasonable and can constitute excessive force. Now, from your perspective, wouldn't the easiest way to resolve this case be to reverse on the warning-related basis alone? That would certainly be one easy and correct way to resolve it. But as you pointed out in our brief and laid out in greater detail, I think there are multiple bases on which to – Can I ask you about the warning issue? I mean, is it not right that it's undisputed that the officers asked him to remove the material from the cell camera, and he refused, using an expletive, and also said, If I'm going to jail, it won't be for something minor. Come here, and I will go to jail for F-ing you cops up. Then they told him that they were going to move him to a padded cell, and he refused, continuing to say that he was going to F them up rather than go to a padded cell. And then they came in to try to effectuate the move that they had told him about, and at that point, he attacked them. So is the claim about the warning that they didn't specifically say, We're warning you that we're going to try to force you to do it before he unleashed the baton, is that the claim? No, Your Honor. They did announce what they were going to do, and then he said, I'm not going to comply. And then they went to try to effectuate it, and then he attacked. Is that not right? The warning is with respect to using the police dog, not a general warning. Yes, but I just said to you a moment ago, I said, But at the time that they used the police dog, there was already a struggle underway that he had lunged for the baton and was struggling with the other officer. And so I said, Well, why would you need to have a warning about the police dog if they're already engaged in a fight? And you said, Well, there hadn't even been an initial warning at the beginning. So doesn't your warning about the dog rely on there not being an initial warning at the beginning? No, Your Honor. I mean, if I'm understanding correctly, initial warning, you're referring to that they're going to extract him from the cell. Our argument is that the officer director said that he gave Mr. McKinney a warning that if he didn't stop fighting that the dog would bite him. Now, neither Officer Warden or Officer Siebel ever heard such a warning, nor does the after action report confirm such a warning. The absence of that warning is critical to the court's analysis and is in violation. Just to clarify this. So your argument is that even though they were struggling over the baton, the officers were required to issue a separate warning that they were going to utilize the dog. That's correct. And also, there's a dispute as to whether or not I mean, at what point Hunter was used and whether or not there was any still any active dispute or active resistance occurring at that time. OK, well, you've reserved time for rebuttal, so we'll hear from you again. But let's hear from the appellee, Mr. Girard. Yes. Thank you. Good morning, judges of the Court of Appeals. I'm Tom Girard and I'm representing the defendants. As your honors know, summary judgment is decided based on undisputed facts. And for at least the past 20 years in our district in Connecticut, we have a procedure in place that defines what those undisputed facts are so the district court can properly decide the motion. The defendant files a 56A1 local rule statement identifying all of the claimed undisputed facts with support from the record and the plaintiff then files. Before you go any further, I thought that our previous holding said that there were facts in dispute and were bound by that previous holding. So the only question that was sent back was not whether there were facts in dispute, but that on those facts which the previous panel said were in dispute, whether on those facts there was qualified immunity. So I don't see how you can come here and argue that there are no disputed facts. We're bound by the previous decision, whether it was right or not. Your Honor, the previous decision was a summary order regarding the reasonableness issue, the Fourth Amendment issue that did not detail qualified or did not address qualified immunity at all. I know, but in order to find that, they had to find that there were facts in dispute. I think, counsel, you might be arguing that there are no disputed facts that would deny qualified immunity. That's exactly right. On the qualified immunity issue, there are no disputed facts. We have a nucleus of salient facts under our process, and the plaintiff has admitted all the facts necessary to award qualified immunity. We went through this process. That's in your joint appendix, 226 to 249, and that's the key to deciding the qualified immunity. Counsel, it isn't only what the defendant may have admitted, which he did. He said he didn't remember and all sorts of things. But if you look at the facts as they were stated by the different police officers, that's what created the dispute. Different police officers said different things that happened here. Some said that he had stopped fighting. Some said that he didn't. And it's that where we have to, on qualified immunity, assume the facts most favorably to the plaintiff, to the person who is suing, and see whether on both facts there is a clearly established law. I kind of agree with you, but if we look at what the plaintiff himself said, I would find it difficult to find dispute. But if I look at what the defendant said, I find all sorts of facts in dispute. Well, those are not material facts, Your Honor. They're technical facts. It's not disputed that this prisoner fought with the officers up until the time he was handcuffed. He was fighting with them when they tried to enter the cell. They tried to brace him up against the back wall to handcuff him, and he fought them then. He got a hold of a baton, which would put a deadly weapon in his hand. There is no question that earlier on in this, the police acted reasonably. They were reasonable in trying to get him to a padded cell. They were reasonable in trying to subdue him when he was fighting them. The question is whether they were still doing something that was clearly wrong after that. And that's what's in dispute. At the time they stick the dog on him, was he already subdued? Well, it's undisputed that he was resisting and had a hold of a police officer's baton. At the time, the dog was directed to his lower leg, not to extract him, but to bite and hold and cause pain compliance. That's undisputed, undisputed by Mr. McKinney and all the officers' reports. It's also undisputed that that was not successful because Mr. McKinney fought with the dog. I'd like to emphasize this, and I'll ask opposing counsel on rebuttal too. But she seems to suggest that it was disputed as to whether the dog was put on him after he had been subdued. But I thought the relevant dispute or the existing dispute was it was disputed as to whether he had stopped resisting and they did not immediately remove the dog. But that it's clear that the dog was put on him while he was still actively resisting. Is that your understanding? Is there anything in the record that suggests that he was subdued before the dog was put on him? There's nothing in the record. And then the admission by Mr. McKinney on Appendix 240, Joint Appendix 240, is that a plaintiff became 39, admission 39. Plaintiff became extremely combative and charged towards the defendant. Admitted. Arrested, deployed canine hunter, directing him to the lower leg at which time they were able to get him on the ground. Admitted. Arrested, gave a warning, police with a canine, stop or you will be bit. That's admitted. This entire process is admitted and the district court properly understood that. All of this, all these facts that the plaintiff is claiming are disputed exist nowhere in our record. I thought that the counsel, I thought that the police said that he was lying face one of them with his arm pinned behind his back. That's Appendix 343. And once he was on the ground, without warning, the arrestor ordered Hunter to get McKinney and bite him over and over again. And at that point, he used his free arm to stop Hunter from biting his leg. But it's the time that they stick the dog on him. He was lying face up with one arm pinned behind his back and no longer resisting. At least that's one view of the fact, as stated by the defendants themselves. And that's the question. If we buy that, which unqualified immunity we have to, is that undue force? Your Honor, that is nowhere in our record. These are hypothetical scenarios in the plaintiff appellate brief only. They are not in the record before the district court or the record before this court that this court needs to do an over review on. It is 100 percent clear and admitted by the plaintiff that that when the dog was ordered to bite him, he had a hole. He was fighting with Siebold on the baton, and that is what that's what incrementally raised the force to use the dog to bite and hold his right leg to get him down. The issue about the cuffing is this. He fought with the dog. So they went to taser and drive suddenly the drive centers pain compliance. They got his left hand in cuff. Then he wouldn't give them the right hand. Still combative. They then get the right hand from behind him. Then they get him in cuff. And then once that happens, the dog is released. That's admission 50 to 52 on page 243 of the appendix. There is no issue on any of this. And that's what Judge Covello in the district court understood all the arguments. But there does seem to be a disagreement a little bit about whether McKinney actively resisted throughout the encounter. Right. So the district court seems to think that he was actively resisting throughout the entire encounter, whereas the parties seem to think that his resistance was passive after they applied the teaser. And he went to the ground. But my understanding, and I'd like you to confirm this, is that it's undisputed that the dog was put on him before the taser was applied. And so the question is whether it is excessive force to continue to use a dog after he had been actively resisting, but at the moment is only passively resisting to use the dog until he's handcuffed or whether it's required to remove the dog immediately. But is there anything in the record or any facts that would suggest that they initiated use of the dog after he had already been put on the ground and after he had already been chased? No. And in fact, it's exactly the opposite, Your Honor. Appendix. These are all admitted facts. Appendix 242, 243, that the plaintiff was rolled onto his stomach and refused to expose his right arm. And then 50. The plaintiff finally gave up fighting and yelled for the defendant to get the canine off him. Ward and de-arrested were then able to handcuff the plaintiff. And once the plaintiff was secured, arrestor broke Hunter off the right leg. So this all happened. There was no compliant person who was being tased, hurt, used any force whatsoever. Once he stopped the combat, that's when handcuffing happened. And once he was handcuffed, then he was secured. Importantly, if you have one hand in handcuffs and they did get his left hand in handcuffs from the taser, you're not safe until you have the right hand in handcuffs. Because if his left hand breaks free, he has a weapon that he can swing and hit persons with. And they are, this is not, once again, not an extraction. So you're arguing that even if he was passive after being tased, until he was fully handcuffed, it would have been legitimate to continue to use the dog. Yeah, that you can use something which is that violent force when the person is only passive. That's a remarkable thing on our cases to say that because he might have done something, we can do something as dramatic as having his leg bitten off. But what about the fact of, is there a requirement that before you use a dog, even if a person is resisting, that before you use a dog, you have to give a warning? Well, in 2010, that was not the law, but we did give warning. Well, that's the question. Excuse me. Excuse me. That's a fact in dispute. It isn't in dispute. I'm sorry. He says, I heard no warning. And we have a case called Franco, which says that when somebody says, I didn't hear, when they would have heard if a warning was given, that is enough to put in dispute the question of whether a warning was given. That we have a case. I wrote it. All right. So why don't you just address the idea that even if there wasn't a warning, would it have been clearly established that they weren't allowed to use the dog in the middle of the struggle? That's the question. Well, I want to first answer that, that it's an admitted by Mr. Kinney, that Mr. McKinney, that also do your rest to enter the cell saying police with a canine admitted to the content of arrest this report. And it's right in his report. It's a seventy five of your appendix police with a canine stop or you will be bit. But to judge Beneshe point when all that's happening and there's and it's happening quickly. And you're going from trying to put someone in cuffs by bracing them against the wall to now he's fighting with your baton and potentially has a deadly weapon in his hand. You don't issue a warning when feasible so that someone can then conform their conduct. But this man is an active combat and he's not. So I would submit that the warning requirement does not apply in the middle of combat. But we did give the warning. It's admitted by Mr. McKinney. And it's right there on a seventy five of the appendix. Let's assume. Let's assume for a moment that officers arrested. Did you have the warning for the sake of argument? If you look at the video, there are just two seconds. Before Hunter enters fully into the cell after McKinney is in the cell. Put a reasonable jury conclude that McKinney had no meaningful opportunity to comply with the warning. Based on our admitted our admitted fact that the dog did not go in and bite the dog was commanded to bite during the process that Mr. McKinney admitted occurred that first there was an attempt to brace him against the wall. He then struggled with the baton. And once he had the potential to have a deadly weapon in his hand, then that's when Hunter was directed to his right leg. I thought that Hunter had been, quote unquote, fired up and bit McKinney. Now, fired up is all that means is it's the equivalent of a verbal command to try to get someone to listen to your verbal command. If you put your foot on watch mode, the dog barks and to listen to a German shepherd bark. It scares a lot of people. And they're like, OK, I'm not going to fight. I'm going to let you handcuff me. And so fired up doesn't mean now I'm going to the dog is on his own. He's not being commanded by the police and he's just going to do crazy dog things. Fired up just means he's on watch mode and he was supposed to conform Mr. McKinney to what they wanted to do. But he didn't. It didn't work out. But he was clearly directed that is in our undisputed record. I was he was directed by Arresta. So. Even if McKinney fought in whatever state that he was and said certain things, if the officers said something different, the jury, if it went to a jury, would not need to accept what McKinney said as the truth, but could find what the officers said. The funny thing about this case, which makes it so unusual, is that on what McKinney said, there's much more to be said for the defense. But on the contradictory statement at different points by different ones with the police, the argument the other way is in dispute. And that's where my problem is. And that's why your constant saying he admitted this, he admitted that doesn't answer my problem. Well, your Honor, the material facts that lead to the conclusion of qualified. But the material facts are what was going on. And it's as to those that the officers were saying something different as to whether he was fighting, as to what his state was, as to what was said about the dog. As to all of those, there is considerable difference in the picture that was painted. And that's why I began by saying I thought that some of this was decided, because if we really look just at McKinney's facts, I don't see how the previous holding could have come out the way it did. But it came out the way it did, presumably because they were looking at the whole picture, including what the defendants did. And that's what we've got to look at to see whether something was done, which was excessive in terms of qualified immunity. Well, your Honor, the previous decision did not address qualified immunity, and that's why. I'm not arguing with that. I'm arguing with whether we should, what facts we should look at to decide qualified immunity. I think what we look at is undisputed facts and the plaintiff's version of any disputed facts. All right. So if we have, and that's replete in our case law. Where do you get that statement that we should look at the plaintiff's version of any disputed facts if the defendant's version are more favorable to the plaintiff? What do you cite for that proposition? Well, the only thing I know is that if there are facts in dispute, then we must take them in the light most favorable to the plaintiff. Well, there are many cases, Collin versus Green, going back to like 2002, said the way I said it, that will take undisputed facts and you can still get summary judgment if there are disputed facts, provided you accept the plaintiff's version of that. Now, maybe that's splitting hairs on that. But the point is, Judge, no matter how much, how many ways you look at the tiny little differences and no one sees the same accident from the four corners of the intersection exactly the same way. But if there was a situation, everybody looks at it differently. But the question is, when you look at the different ways that different people look at it, is there a possible finding of facts by the jury, which would lead us to say that the force that was used was undue and that was known? Because if that is so, then qualified immunity does not apply here. It may be that qualified immunity ultimately wins out, but that's not what we're deciding. We're deciding whether there was a dispute of facts sufficiently so that taking those facts in the light most favorable to the plaintiff would give rise to undue force and clearly define such. My response to that, Your Honor, is there is no dispute of fact on the important sequence that leads to qualified immunity, the initial command. So hands on, when the dog bit, when the baton was used, when the taser was used, and then eventually everyone agrees that when once he was secured, the dog was broken off. There was no force used on a subdued, handcuffed person. He was told to stop resisting, and he didn't. When he did, that's when handcuffing happened. The dog was not sent in to extract him. There's no issue about that. He was not, you know, he didn't grab the baton to stop the beating. He was being pushed up against the wall with the baton. He wasn't being beaten. That's nowhere except the plaintiff's appellate brief that he went in and was charged, that we charged him and hit someone in the head. No one says that. So you might be able to find a little bit, if you want to put the thousand power microscope on all these police reports, that someone says this and someone said it a little different. But on all these salient facts that lead you down the path of a concrete nucleus on which to decide, you get to the point where that this was incremental force. And certainly there was no clearly established law that said that they could not do that as of 2011. We raised Judge Livingston's decision in Tracy versus Freshwater only four months before, where there was a noncompliant suspect who was hit over the head with a flashlight several times, jumped on by the officer, forcibly moved from the ground, even though he was in pain and he couldn't move. And then all of that was deemed not clearly established he couldn't do that, and qualified immunity applied. So this is four months before our event in Middletown. This comes from the Court of Appeals. And the one thing that the advisor was something that wasn't protected. And that was pepper spray inches from the face after already handcuffed and not resisting. So that's how the law was developed back then. And I think we complied with it. And I thank you for hearing me and I'll otherwise rely on the brief. Okay, thank you, Mr. Gerard. We'll turn back to Ms. Alenowicz-Hess on rebuttal. There's a disputed issue of fact as to whether or not. Can I ask you about the sequence of events? As I said before, I think my understanding was that he was engaged in an altercation with the officers who were trying to move him from the cell. He was actively resisting. He had tried to grab the baton. They applied the dog. Then they teased him. Then he went to the ground. And then there's a dispute as to whether he continued to actively resist or he was only passively resisting. And so the argument is if he was only passively resisting at that point, was it excessive that they continued to allow the dog to be applied to him as opposed to withdrawing the dog immediately? That was my understanding. But you seem to suggest that maybe the dog was initiated while he was on the ground. Is that right? Yes, Your Honor. So there are – so Mr. McKinney's version of events, which can be found on pages, Joint Appendix 343 to 44, indicate that Officer Siebold entered the cell and, quote, unquote, bashed Mr. McKinney in the head with a baton. Mr. McKinney fell down with his arm pinned beneath him. And at that point, when he's already lying on the ground with his arm pinned beneath him, the dog bites him over and over again. And the dog was not applied at all before that point, you're saying, according to this version of events? That's correct, Your Honor. And the officers have different versions themselves, also, the order in which the force was applied. So according to Officer DiResta, it's the – their baton is deployed, then the canine, and then Officer DiResta – Can I ask you about these admissions? I mean, usually when you talk about a disputed question of facts, it's a disputed question between the parties. But here, Mr. McKinney's – the argument seems to be that Mr. McKinney's version of events are less sympathetic to his case than the defendant's version. So can I ask, did Mr. McKinney repudiate the admissions that he had made for his version of events? So taking the – yes, so in looking at his – well, I guess not subsequent to the – after the 56.1 statement, but if you look at the deposition, Mr. McKinney's deposition, and viewing it in the light most favorable to him, he does dispute the order of events put forth as admitted in the 56.1. But in the 56.1 statement, he said things like, admitted, but you shouldn't rely on my deposition. So then he's sort of saying, my deposition didn't contain an admission, but I am now, in this statement, admitting to this version of events. Is that not the most straightforward way to read it? I don't think that's the most straightforward way to read it. If you look at what he's – if you look at the whole paragraph, he says that Mr. McKinney's – I would understand to be that he's disputing the reliance of that Mr. McKinney's testimony supports what the defense is saying. Counsel, counsel, am I correct to read that what he was saying is, this is what is said to have happened, and I am not in a position to deny it, because I don't really know what was going on. So that while he was stating a view, he wasn't saying that that view was in fact the right one. He was saying, I can't deny it. I was out of it, which is a rather remarkable and, you know, maybe strangely honest thing for somebody to say, because an awful lot of the time in a situation like that, I expect you don't know enough. And that what he was saying was, to the extent they say X, unfavorable to me, I can't say that that wasn't so. Isn't that what he is saying, rather than saying something unfavorable to me actually happened? That's correct, Your Honor. And during his deposition, he also says – makes similar comments that if they say that that's what they saw, you know, that he can't dispute it. But if you look at his deposition, he does – he may not have a complete recollection, but he does have a recollection of events, and the district court was required – Isn't admitting a fact a very weird way of saying I have a basis to dispute it? And again, I think you're saying in this proceeding that he does have a basis because he has testimony from other parties who are present. So wouldn't one normally say in response to – in a Rule 55.1 statement, disputed, the factual allegation is disputed, and the basis he has for disputing it is the testimony of the other officers? I think that that would have been a more artful way of stating it. I can't explain why it was done this way, but I do think it's clear, based on the repeated reference to the fact that Mr. McKinney – I mean, it's obviously not clear. Like, I mean, it doesn't say admitted there. I mean, so, like, we are trying to deal with the ambiguity. But why should we understand the word admitted to actually mean denied? I don't see the saying it's denied. I see it – it's – what it's saying is every time the defendants cite to both Mr. McKinney's deposition and their own use of force reports, which is a prevailing citation throughout the 56.1 statement, every time plaintiff's counsel is disputing the reliance on Mr. McKinney's deposition. So only leaving you with – only leaving the court with the use of force report. And I think that is, in effect, saying that they cannot – that Mr. McKinney's deposition testimony does not support the points that they're making in their 56.1 statement. And moreover, taking 56.1 statement collectively – So I get that. But even if he's saying that his deposition doesn't support that, isn't it his – I mean, isn't he obliged to point to something in the record that shows that the fact that the other side has alleged is actually disputed, that there's some fact in the record that shows that this is a disputed fact as opposed to simply saying my deposition doesn't support this fact? Like, he has to point to something in the record to show that there's a dispute on it, right? That's correct, under the local rule. But that's not sufficient. So the court – the district court, even though it's inartfully responded to, the court cannot simply just accept all of the admissions and call it a day. The court is still required to review the record to assure itself that there's a coherent narrative event and that there is no genuine dispute of material fact. And here, reviewing even Mr. McKinney's deposition and then as well the internally inconsistent officer statement, if the court fails to reconcile any of these internally inconsistent statements in a manner that establishes – Even though it's the obligation of the party to point to something in the record to show that the fact is disputed, you're saying that the judge was obligated to scour the record to see if, in fact, there was something in the record that would dispute the fact. Yes, under second circuit case law, that's correct. Okay, thank you, thank you. Thank you very much. The case is – Very well argued by both sides. Thank you very much, both sides. Very well argued. Thank you very much. Thank you, your honors. Thank you. Okay, thank you. The case is submitted and because that is the last case in our argument calendar today, we are adjourned. Court is adjourned.